UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYNK MEDIA, LLC,

                                    Plaintiff,

        v.

PEACOCK TV LLC and NBCUNIVERSAL
MEDIA, LLC,

                                    Defendants.

Civil Action No.:  1:23-cv-05845-JGK

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

---

Wilson Elser Moskowitz Edelman & Dicker LLP
Attorneys for Defendants
150 East 42nd Street
New York, New York 10017

## Table of Contents

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

     A.    Use No. 1 .................................................................................................. 5

     B.    Use Nos. 2, 3, 4, and 5 ............................................................................ 5

     C.    Use Nos. 6 and 7 ...................................................................................... 5

     D.    Use No. 8 .................................................................................................. 6

     E.     Use No. 9 ................................................................................................. 6

     F.    Use  No. 10 .............................................................................................. 7

     G.    Use No. 11 ................................................................................................ 7

     H.    Use Nos. 12 and 13 ................................................................................. 7

     I.    Use No. 14 ................................................................................................ 8

     J.    Use No. 15 ................................................................................................ 8

ARGUMENT ....................................................................................................................... 8

     I.    Legal Standard ......................................................................................... 8

     II.    Plaintiff's Copyright Claim Is Barred by the Fair Use Doctrine ........................... 9

     A.    First Factor – Purpose and Character of the Work ................................... 11

     B.    Second Factor – Nature of the Copyrighted Work ................................... 13

     C.    Third Factor – Amount and Substantiality of the Portion Used ............... 14

     D.    Fourth Factor – Effect on the Potential Market ....................................... 15

CONCLUSION .................................................................................................................... 16

<u>**Table of Authorities**</u>

**Page(s)**

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
143 S. Ct. 1258 (2023) .......................................................................................11, 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ......................................................................................................9

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006) ......................................................................................13

*Brown v. Netflix,*
855 Fed. Appx. 61 (2d Cir. 2021) ............................................................................11

*Brown v. Netflix, Inc.,*
462 F. Supp. 3d 453 (S.D.N.Y. May 27, 2020) ..........................................9, 14, 16

*BYD Co. Ltd. v. Vice Media LLC,*
No. 20-cv-3281, 2021 U.S. Dist. LEXIS 64027, 2021 WL 1225918 (S.D.N.Y. Mar.
31, 2021) ........................................................................................................................9

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ............................................................................................12, 14

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013) ......................................................................................14

*Cox v. Perfect Bldg. Maint. Corp.,*
No. 16-cv-7474, 2017 U.S. Dist. LEXIS 111202, 2017 WL 3049547 (S.D.N.Y. Jul.
18, 2017) ........................................................................................................................9

*Cramer v. Netflix, Inc.,*
2023 U.S. Dist. Lexis 165510 (W.D. Pa. Sept. 18, 2023) ......................................13

*Effie Film, LLC v. Murphy,*
932 F. Supp. 2d 538 (S.D.N.Y. 2013)........................................................................9

*Grant v. Trump,*
563 F. Supp. 3d 278 (2021) (Koeltl, J.) .............................................................14, 15

*Hachette Book Grp., Inc. v. Internet Archive,*
2023 U.S. Dist. LEXIS 50749 (S.D.N.Y Mar. 24, 2023) (Koeltl, J.)................12, 15

*Harper & Row Publishers v. Nation Enters.,*
471 U.S. 539 (1985)....................................................................................................11

*Hofheinz v. Discovery Commc'ns, Inc.,*
    2001 U.S. Dist. LEXIS 14752 (S.D.N.Y. 2001) ................................................................10

*Laureyssens v. Idea Grp., Inc.,*
    964 F.2d 131 (2d Cir. 1992) ................................................................10

*Lombardo v. Dr. Seuss Enters., L.P.,*
    279 F. Supp. 3d 497 (S.D.N.Y. 2017) ................................................................9

*Maxtone-Graham v. Burtchaell,*
    803 F.2d 1253 (2d Cir. 1986) ................................................................10

*Monster Commc'ns, Inc. v. Turner Broad. Sys.,*
    935 F. Supp. 490 (S.D.N.Y. 1996) ................................................................10

*Nielsen v. Rabin,*
    746 F.3d 58 (2d Cir. 2014) ................................................................9

*Progressive Credit Union v. City of N.Y.,*
    889 F.3d 40 (2d Cir. 2018) ................................................................8

*TCA TV Corp. v. McCollum,*
    839 F.3d 168 (2d Cir. 2016) ................................................................9

**Statutes**

17 U.S.C. § 106 ................................................................9

17 U.S.C. § 107 ................................................................10, 11, 13, 14, 15

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................1, 8

Defendants Peacock TV LLC ("Peacock") and NBCUniversal Media, LLC ("NBCU") (collectively, "Defendants"), by their attorneys, respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Amended Complaint (Dkt. No. 19) ("Complaint") filed by Plaintiff Lynk Media, LLC ("Plaintiff"), pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

This action arises from the production of a documentary titled *Four Seasons Total Documentary* (the "Documentary"), which portrays the story of Marie Siravo, who owns and operates Four Seasons Total Landscaping alongside her family and employees. Ms. Siravo was caught "in the eye of the storm" when her business was selected as the unlikely location for a press conference held by Donald Trump's lawyers following the 2020 presidential election. The press conference went viral, not only because of the contentiousness surrounding the election and the controversial statements made by Rudy Giuliani regarding alleged election fraud, but also because of the public speculation as to why the Trump team hosted its press conference in the parking lot of a landscaping business. Theories included the suggestion that it was a simple error or that the Trump team assumed the Four Seasons Hotel would be available and, when it was not, they went with the next similarly named location near Philadelphia. The Documentary expands on the public's understanding of this unique moment in political history by introducing viewers to the family behind Four Seasons Total Landscaping.

The Documentary chronicles the story of Marie Siravo and her business. The viewer learns about how she almost lost her business when she accepted the opportunity to host the press conference, receiving tremendous public backlash, but ultimately turned things around and saved her business through savvy use of social media and the like. The focus of the Documentary is fixed

on Four Seasons Total Landscaping, as it spotlights Ms. Siravo and her employees (including her son/employee Michael Siravo) through never-before-seen interviews.

In order to illustrate to viewers what its subjects experienced that day, the Documentary also uses clips of a few seconds at a time to depict the political protests and press conferences that followed the 2020 presidential election. As is relevant to the current action, the Documentary uses short clips of Rudy Giuliani's press conference at Four Seasons Total Landscaping, and a clash between supporters of Joe Biden and Donald Trump surrounding the results of the 2020 election. As briefly presented in the Documentary, these short clips are used to contextualize what it was like for the owners and employees of a small business to get caught up in this national controversy.

Plaintiff's videos are a combined 11 minutes and 10 seconds in length. Of those 11 minutes and 10 seconds, the Documentary uses only one minute of combined footage across the Documentary's 29-minute duration, and no single use lasts longer than 7 seconds (with most uses being only 2-4 seconds long). Moreover, the uses occur mainly with original voice over narration of Ms. Siravo and her son explaining their experience of the events to the viewer. Thus, the disputed uses typically do not use the original videos' audio.

Nevertheless, Plaintiff attempts to plead a cause of action for copyright infringement based on this exceedingly narrow and transformative usage. Plaintiff's copyright infringement claim fails because the Documentary's use of these videos is protected by the fair-use doctrine. The use of copyrighted work in documentaries is overwhelmingly considered fair use under copyright law. Moreover, each of the statutory fair use factors weighs heavily in favor of Defendants. Of key importance, although Plaintiff strains to create an illogical inference that Defendants are usurping Plaintiff's market for the work, they are not. A prospective licensee in the market for Plaintiff's videos is highly unlikely to look to Defendants' Documentary about a family-owned landscaping

company for its fleeting use of Plaintiff's footage. Defendants' Documentary does not substitute for Plaintiff's work in any way. Rather, Defendants' use of the work is transformative, taking a highly factual work (Plaintiff's videos) and using it only to the extent necessary to profile the Documentary's subjects and educate the public about how a unique moment in political history had an unexpected and powerful impact on a small family business.

Plaintiff filed its initial Complaint on July 7, 2023 (Dkt. No. 1). Defendants responded with a pre-motion letter outlining its fair use defense, as well as raising issues regarding Plaintiff's standing to bring suit (Dkt. No. 11). Subsequently, Plaintiff filed an Amended Complaint with exhibits on October 2, 2023 (Dkt. No. 19). In supplementing its allegations in the Amended Complaint, Plaintiff failed to add anything substantive that changes the fair use analysis. As a consequence, the operative Complaint cannot survive scrutiny and should be dismissed as a matter of law in its entirety.

## FACTUAL BACKGROUND

Plaintiff alleges that on November 7, 2020, a videographer of non-party FNTV, LLC ("FNTV") authored a video of Rudy Giuliani speaking at Four Seasons Total Landscaping about voter fraud in the 2020 election ("Video 1"). Cmpl. ¶ 14.[1]  Plaintiff also alleges that another FNTV videographer authored a second video of supporters of Joe Biden and Donald Trump fighting about the results of the 2020 election ("Video 2"). Cmpl. ¶ 21. Plaintiff claims that it is the holder of rights to Video 1 and Video 2 (collectively, the "videos-in-suit"), and purportedly acquired the rights to the videos-in-suit with the intention of licensing them for commercial use. Cmpl. ¶ 16.

---

[1] Citations to "Cmpl." refer to Plaintiff's First Amended Complaint, dated October 2, 2023 (Dkt. No. 19).

Plaintiff further alleges that the videos-in-suit were copied and displayed in the Documentary without permission. Cmpl. ¶¶ 45-48.

The Documentary recounts the events occurring at the Rudy Giuliani press conference, and more importantly, what led up to it and the ramifications endured by Four Seasons Total Landscaping for hosting the event. *See* Dkt. No. 19, Ex. 6, 7. The Documentary begins with Marie Siravo and her employees describing their roles at Four Seasons Total Landscaping and what their family-run business means to all of them. *Id*. The Documentary continues by providing a behind-the-scenes look at the general confusion surrounding the press conference, including the chaos prior, the hosting of the event itself, the falling out for the business, and lastly, Four Seasons Total Landscaping's rebounding popularity with the public. *Id*.

To do so, the Documentary largely utilizes interviews with Four Seasons Total Landscaping's owner, employees, and others who experienced the events. Rather than focusing only on the subject's faces, in some places the Documentary accompanies the interviews with footage of the events the subjects describe—allowing viewers to understand what the subjects saw and experienced at the time. The interviews tell the story of a business that was widely criticized for hosting and "supporting" the Trump legal team's controversial press conference. *Id*. Four Seasons Total Landscaping was contacted by national and international press regarding how it became the site of this press conference. *Id*. Ultimately, the public became invested in this story, which is what allowed Four Seasons Total Landscaping to shift the narrative. *Id*.

In total, there are fifteen alleged uses of the videos-in-suit in the Documentary. Each alleged use is summarized, and contextualized, below.

### A.  Use No. 1

Seconds before this use, Michael Siravo appears solo on screen. Dkt. No. 19, Ex. 3, 6, 7. During the five second use of Plaintiff's video, Michael narrates his personal reaction to the arrival of Rudy Giuliani at Four Seasons Total Landscaping before the press conference. *Id.* Plaintiff's video image simultaneously depicts Rudy Giuliani waving at the public. *Id.* At the very end of the use, Marie Siravo interjects and subsequently appears solo on screen describing her other son Anthony's reaction to the arrival of Rudy Giuliani at the business. *Id.*  No sound from Plaintiff's video is utilized. *Id.*

### B.  Use Nos. 2, 3, 4, and 5

Seconds before this use, Marie Siravo appears solo on screen recounting her reaction to Rudy Giuliani sitting at her desk. Dkt. No. 19, Ex. 3, 6, 7. The viewer is then presented with Plaintiff's video depicting supporters on both sides screaming at each other, focusing in on the police on site to pacify the scene and demonstrating the groundswell of controversy surrounding the imminent press conference. *Id.* Uses 2-5 occur one after another for a combined total of fourteen seconds. *Id.*  Immediately after the uses, Michael Siravo appears solo on screen describing the crowd of supporters of both presidential candidates arguing against each other outside the business prior to the conference. *Id.*

### C.  Use Nos. 6 and 7

Seconds before this use, Michael Siravo is in the middle of recounting the chaos of supporters screaming at each other outside Four Seasons Total Landscaping prior to the press conference. Dkt. No. 19, Ex. 3, 6, 7. During the use of Plaintiff's video, Michael narrates the arrival of police and the shutting down of the road in front of the business. *Id.* Plaintiff's video image simultaneously depicts police arriving on the scene. *Id.*  No sound from Plaintiff's video is utilized.

*Id.* Uses 6-7 occur one after another for a combined total of four seconds. *Id.* Immediately after the use, Michael appears solo on screen describing the event as nerve wracking, followed by Marie Siravo solo on screen stating that the occurrences preceding the press conference were overwhelming for her. *Id.*

### D.  Use No. 8

Seconds before this use, Marie Siravo relates how she stood on top of a trailer to watch the press conference ensue. Dkt. No. 19, Ex. 3, 6, 7. Immediately preceding and during the use of Plaintiff's video, Olivia Nuzzi, Washington Correspondent for *New York Magazine*, narrates her understanding that the Trump campaign worked hard to keep Rudy Giuliani busy so that he would not run wild creating issues for the Trump team. *Id.* Plaintiff's video image simultaneously depicts Giuliani walking towards the podium to begin the press conference. *Id.* No sound from Plaintiff's video is utilized, and the use lasts for approximately seven seconds. *Id.* Immediately after the use, Nuzzi appears on screen to provide general commentary regarding Rudy Giuliani unrelated to Plaintiff's video. *Id.*

### E.  Use No. 9

Seconds before this use, Michael Siravo appears solo on screen describing Rudy Giuliani as "nothing but respectful," taking pictures with employees from Four Seasons Total Landscaping. Dkt. No. 19, Ex. 3, 6, 7. Simultaneously, viewers are presented with a photo of Giuliani and Marie Siravo. *Id.* Then, during the use of Plaintiff's video, Michael narrates the fact that Giuliani greeted police officers outside the business. *Id.* Plaintiff's video image simultaneously depicts Giuliani walking over to police officers and shaking their hands. *Id.* No sound from Plaintiff's video is utilized and the use lasts approximately four seconds. *Id.* Immediately after the use, Michael appears solo on screen continuing his thoughts on Giuliani. *Id.*

### F.  Use  No. 10

Seconds before this use, reporter Olivia Nuzzi is solo on screen describing the fact that Giuliani once told her that his view of his legacy was "F– it." Dkt. No. 19, Ex. 3, 6, 7. The viewer is then presented with approximately five seconds of Plaintiff's video of Giuliani walking towards the podium and greeting the crowd. *Id.* Immediately after the use, the viewer is presented with further images of Giuliani at the podium from other sources. *Id.*

### G.  Use No. 11

Seconds before this use, Richard Hall, Senior US Correspondent for *The Independent*, is solo on screen describing Giuliani's speech at the podium which included allegations of election fraud and a stolen election. Dkt. No. 19, Ex. 3, 6, 7. Hall's narration then continues over approximately four seconds of Plaintiff's video images of Giuliani speaking at the podium. *Id.* At the very end of the use, Karen Heller, National Features Reporter of the *Washington Post* interjects with narration and then subsequently appears solo on screen. Dkt. *Id.* No sound from Plaintiff's video is utilized. *Id.*

### H.  Use Nos. 12 and 13

Seconds before this use, "Sean" (an employee of Four Seasons Total Landscaping) appears solo on screen describing his thoughts on the conference, followed by video of Giuliani at the podium. Dkt. No. 19, Ex. 3, 6, 7. The viewer is then presented with approximately two seconds of Plaintiff's video which is of the crowd of journalists listening to Giuliani speak at the press conference. *Id.* A second five second clip of Plaintiff's video follows in which Giuliani claims ballot fraud. *Id.* Immediately after both uses, Marie Siravo appears solo on screen with her reaction to Giuliani's speech. *Id.*

**I.** <u>**Use No. 14**</u>

Seconds before this use, Marie Siravo appears solo on screen with her reaction to Giuliani's speech. Dkt. No. 19, Ex. 3, 6, 7. The viewer is then presented with approximately six seconds of Plaintiff's video of Giuliani further claiming ballot fraud. *Id.* Immediately after the use, reporter Karen Heller appears solo on screen describing the moment when a reporter at the press conference reveals to Giuliani that the election has been called in favor of Joe Biden. *Id.*

**J.** <u>**Use No. 15**</u>

Seconds before this use, reporter Karen Heller appears solo on screen describing the moment when a reporter at the press conference reveals to Giuliani that the election has been called in favor of Joe Biden. Dkt. No. 19, Ex. 3, 6, 7. An image of Biden as president-elect then appears. *Id.* The viewer is next presented with Plaintiff's video of the moment where Giuliani derisively exclaims "all the networks!" in reaction to the call. *Id.* The clip lasts approximately four seconds. *Id.* Immediately after the use, the viewer is presented with further images from other sources depicting Giuliani throwing his hands up in the air in response to the call of the election. *Id.*

\*       \*       \*

On the basis of the foregoing usage, which consists of a combined total of one minute across the 29-minute Documentary, Plaintiff attempts to plead a single cause of action for copyright infringement under the United States Copyright Act. As discussed in greater detail below, this action should be dismissed on the pleadings for failure to state a claim.

<u>**ARGUMENT**</u>

**I.** <u>**Legal Standard**</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiff must "plead enough facts to state a claim to relief that is plausible on its face." *Progressive Credit Union v. City of*

*N.Y.*, 889 F.3d 40, 48 (2d Cir. 2018) (internal quotation marks and citation omitted).  A court may consider, in addition to the allegations in the complaint, documents incorporated by reference or relied upon by the plaintiff in bringing suit, as well as judicially noticeable matters. *BYD Co. Ltd. v. Vice Media LLC*, No. 20-cv-3281, 2021 U.S. Dist. LEXIS 64027, 2021 WL 1225918, at *2 (S.D.N.Y. Mar. 31, 2021).

A complaint cannot rest on "conclusory allegations or legal conclusions couched as factual [conclusions]," nor are "threadbare recitals of the elements of a cause of action" sufficient to withstand a motion to dismiss.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citations omitted); *accord Cox v. Perfect Bldg. Maint. Corp.*, No. 16-cv-7474, 2017 U.S. Dist. LEXIS 111202, 2017 WL 3049547, at *2 (S.D.N.Y. Jul. 18, 2017). A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

Further, "Courts within this Circuit have consistently considered motions to dismiss and motions for judgment on the pleadings regarding copyright infringement claims." *Brown v. Netflix, Inc.*, 462 F. Supp. 3d 453, 460 (S.D.N.Y. May 27, 2020). Specifically, the Second Circuit "has acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim." *TCA TV Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016)*. See also Lombardo v. Dr. Seuss Enters., L.P.*, 279 F. Supp. 3d 497, 504-505 (S.D.N.Y. 2017); *Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538 (S.D.N.Y. 2013) (resolving copyright infringement claim on motion for judgment on the pleadings, comparing screenplays side-by-side).

## II.     Plaintiff's Copyright Claim Is Barred by the Fair Use Doctrine

Copyright owners are entitled to six exclusive rights under 17 U.S.C. § 106 including the right to reproduce and display. To state a claim for infringement a plaintiff must establish (1)

ownership of a valid copyright and (2) defendant's infringement by unauthorized copying. *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139 (2d Cir. 1992). However, "the fair use of a copyrighted work…is not an infringement of copyright." *See* 17 U.S.C. § 107. Accordingly, fair use is a complete defense to a claim of copyright infringement. *Id*.

"The purpose of fair use is to create a limited exception to the individual's private property rights in his expression -- rights conferred to encourage creativity -- to promote certain productive uses of copyrighted material." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1255 (2d Cir. 1986). Examples of fair use include use of copyrighted works for criticism, comment, news reporting, scholarship, or research etc. *See* 17 U.S.C. § 107.

It is well established that "[d]ocumentaries and biographies fall within the protected categories of section 107 and are entitled to the presumption that the use of the copyrighted material is fair." *Hofheinz v. Discovery Commc'ns, Inc.*, 2001 U.S. Dist. LEXIS 14752, at *11 (S.D.N.Y. 2001). For example, this Court has previously stated that a documentary about Muhammad Ali was a biography and therefore constituted a combination of "comment, scholarship and research, all of which enjoy favored status under § 107." *Monster Commc'ns, Inc. v. Turner Broad. Sys.*, 935 F. Supp. 490, 493-494 (S.D.N.Y. 1996). In the instant case, the Documentary is entitled to a similar presumption of fair use because it tells the story of Marie Siravo, her family, and her business, and provides commentary on a national political event that had a deeply personal effect on Ms. Siravo.

"The four factors identified by Congress as especially relevant in determining whether the use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; [and] (4)

the effect on the potential market for or value of the copyrighted work." *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 560-61 (1985). Each factor will be addressed in turn.

### A.  First Factor – Purpose and Character of the Work

The first factor considers the "purpose and character" of the reproduced work or the "secondary use." 17 U.S.C. § 107(1). The purposes listed in § 107 reflect "'the sorts of copying that courts and Congress most commonly ha[ve] found to be fair uses,' and so may guide the first factor inquiry." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994)). The examples of purposes listed in § 107 "are easily understood" as fair use as they "contemplate the use of an original work to 'serv[e] a manifestly different purpose from the [work] itself." *Id.* at 1275 (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021)).

For example, the Second Circuit recently held that a documentary fit the uses identified in § 107 specifically because the documentary provided "a commentary on the burlesque art form" and an "exploration of the artistic process of the group of dancers on whom the Film centers. The Film d[id] not merely re-broadcast the performances; rather, it combine[d] those performances with cultural commentary…" *See Brown v. Netflix*, 855 Fed. Appx. 61, 62-63 (2d Cir. 2021). Here, the Documentary's use of the videos-in-suit similarly provides a unique perspective on the events that took place in the Four Seasons Total Landscaping parking lot. The Documentary examines the events through the lens of a small business owner, adding original commentary and insight regarding the greater picture of the country's cultural moment and the resulting public backlash that Four Seasons Total Landscaping received and overcame.

The central question that the first factor considers is "whether the new work merely 'supersede[s] the objects' of the original creation ('supplanting' the original), or instead adds

something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc.*, 143 S. Ct. at 1274 (quoting *Campbell*, 510 U.S. at 579). Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright" and the more transformative the new work, the less the significance of other factors like commercialism. *Campbell*, 510 U.S. at 579.

Here, the nature of the Documentary's use is both educational and expressive, rather than merely factual. The Documentary explores the confusing moments leading up to the Trump campaign press conference and posits the various theories behind the selection of the unlikely location. It takes videos created merely for the factual purpose of documenting the Giuliani press conference, and other events after the election, and uses them for the distinct purpose of showing viewers how those events were experienced by some people who never expected to get swept up in the post-election controversies.

In other words, the purpose of the Documentary was not to supplant Plaintiff's footage but rather to "reproduce the Works in Suit to provide criticism, commentary, or information about them." *Hachette Book Grp., Inc. v. Internet Archive*, 2023 U.S. Dist. LEXIS 50749, at *25 (S.D.N.Y Mar. 24, 2023) (Koeltl, J.). The Documentary is a transformative use of Plaintiff's footage because it weaves Plaintiff's recordings of a viral moment into a larger creative narrative about the divisive political climate's impact on a small business. Each use of Plaintiff's footage is encased by original commentary, both before and after. The original commentary is directly related to the material in Plaintiff's footage, in many cases in the form of reactions to Giuliani's behavior that the subjects witnessed firsthand. In a majority of the cases, the sound of Plaintiff's recordings is not used, and when it is used, it is done to add further context, such as in the case of use Nos. 2,

3, 4, and 5 where the sound is needed to understand the chaos breaking out amongst supporters on both sides, and why this was "nerve-wracking" and "overwhelming" for the interview subjects.

Finally, unlike the instant case, a use may not be transformative when it shares a substantially similar purpose to the original work. *See Cramer v. Netflix, Inc.*, 2023 U.S. Dist. Lexis 165510, at *20 (W.D. Pa. Sept. 18, 2023) ("Goldsmith's photograph and AWF's use shared substantially the same purpose, namely, to be commercially sold as portraits of Prince in magazine stories about Prince."). Here, however, the Documentary and the videos-in-suit serve entirely antithetical purposes. The Documentary does not use the videos-in-suit to reproduce the content of the press conference *in toto* as a dry historical record. Rather, the Documentary uses very brief excerpts of the videos-in-suit to profile a small business owner and to explore the manner in which a political event unexpectedly almost caused her business to fail. As a result, the first factor weighs heavily in favor of fair use.

### B.  Nature of the Copyrighted Work

The second factor considers the "nature of the copyrighted work." 17 U.S.C. § 107(2).  The analysis turns on whether the work is expressive and creative, or more factual, with greater leeway for a claim of fair use when the work is informational. *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006).

Here, the videos-in-suit are factual in nature. They document the occurrences of an extremely newsworthy political press conference during a very contentious presidential election and capture the surrounding, highly charged environment. The videographers did not create the scene or stage the subjects. The story of Mr. Giuliani's press conference was heavily covered and recorded not only by FNTV videographers and national media but also by international journalists. The videos-in-suit provide nothing more than a record of the speech and occurrences at an event

of public interest. In this way, the videos-in-suit are merely a recordation of an event held in the public square about matters of public concern.

Moreover, even if Plaintiff were able to argue that its work is creative in nature, "where the first statutory factor favors secondary use due to modest transformative use…the second factor 'plays no significant role'" *Brown*, 462 F. Supp. 3d at 462 (quoting *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018)). Accordingly, the second factor also supports a finding of fair use.

### C.  Third Factor – Amount and Substantiality of the Portion Used

Under the third factor, courts consider the amount and substantiality of the portion used in relation to the copyrighted work as a whole. 17 U.S.C § 107(3). This factor "calls for thought not only about the quantity of the materials used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. "The quantitative inquiry considers whether the secondary use 'employs more of the copyrighted work than is necessary,' whereas the qualitative inquiry asks whether the use was 'excessive in relation to any valid purposes asserted under the first factor.'" *Brown*, 462 F. Supp. 3d at 462. In some contexts, even including the heart of the work is not considered excessive. *Id*. at 463 (citing *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 326 (S.D.N.Y. 2008). When a work is transformative, "the secondary use must be [permitted] to conjure up at least enough of the original to fulfill its transformative purpose." *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) (quoting *Campbell*, 510 U.S. at 588). The ultimate question is whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying. *Grant v. Trump*, 563 F. Supp. 3d 278, 288 (2021) (Koeltl, J.) (citing *Campbell*, 510 U.S. at 586).

Here, Video 1 has a length of 6 minutes and 4 seconds and Video 2 has a length of 5 minutes and 6 seconds. Only 42 seconds and 18 seconds of each video, respectively, are used in the Documentary. Each individual use is a maximum of seven seconds long. A total of one minute is used within the 29-minute Documentary, of which in the majority of the uses the videos' sound is not included. When the sound is included, such as in use Nos. 2, 3, 4, and 5, the use is reasonable because the sound is essential to accurately conjure the chaos of the moment lived outside of Four Seasons Total Landscaping prior to the press conference. Moreover, the portions used were reasonable in light of the inclusion of extensive original commentary on the press conference, which both precedes and follows every disputed use.

Further, qualitatively, the segments used cannot be considered the "heart" of the work. As a factual work, the heart of the videos-in-suit must be the content of the press conference itself in order to provide viewers with a complete understanding of the claims made by Giuliani on that day. But the vast majority of the videos-in-suit where Giuliani (and others) speak at the podium to support their claims of ballot fraud is completely unused in the Documentary. Therefore, the third factor also weighs heavily in favor of fair use.

### D. Fourth Factor – Effect on the Potential Market

The final factor considers "the effect of [the secondary] use upon the potential market for or value of the copyrighted work." 17 U.S.C § 107(4). Specifically, this factor looks not at the damage the second work would cause on the market for the first work but rather whether it usurps the market by offering a competing substitute. *Grant*, 563 F. Supp. 3d at 288 (Koeltl, J.). "An accused infringer usurps an existing market 'where the infringer's target audience and the nature of the infringing content is the same as the original.'" *Hachette Book Grp., Inc.*, 2023 U.S. Dist. LEXIS 50749, at *40 (Koeltl, J.) (citation omitted). This factor is "undoubtedly the single most

15

important element of fair use." *Brown*, 462 F. Supp. 3d at 463 (quoting *Harper & Row*, 471 U.S. at 566).

Here, the Documentary has a much broader focus than the videos-in-suit, examining primarily through subject interviews how Giuliani's press conference affected Four Seasons Total Landscaping, its owners and employees. By contrast, Plaintiff's videos merely capture the events that occurred that day. No one would watch the Documentary exclusively (or even partially) for Plaintiff's videos.

Moreover, as used in the Documentary, the disputed clips of the videos-in-suit consist of snippets of mostly five seconds or less and a viewer would not obtain a comprehensive understanding of the full content of Plaintiff's videos from watching the Documentary. Accordingly, the Documentary does not usurp the market for the original work in any way and the fourth factor also weighs heavily in favor of fair use.

*      *      *

Taken together, all four fair use factors tip heavily in favor of Defendants, warranting dismissal on the pleadings. Therefore, the Court should grant Defendants' motion to dismiss because fair use is a complete defense to Plaintiff's claim of copyright infringement and Plaintiff cannot state a claim upon which relief can be granted.

<h2 style="text-align:center"><u>CONCLUSION</u></h2>

In light of the foregoing, Defendants request that the Court grant this Motion, dismiss the Amended Complaint in its entirety with prejudice, and grant any other and further relief that the Court deems just and proper.

Dated: New York, New York
      October 23, 2023

16

Yours, etc.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP

By: _____
Stephen J. Barrett
Jura C. Zibas
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000
Stephen.Barrett@wilsonelser.com
Jura.Zibas@wilsonelser.com
File No.: 13463.00240

*Attorneys for Defendants*

17

## <u>CERTIFICATE OF COMPLIANCE</u>

This memorandum complies with the formatting and word-count limitations set forth in

Judge John G. Koeltl's Individual Practices, Rule II.D.  This memorandum contains 4,898 words

based on the Microsoft Word word-count function.

_____
Stephen J. Barrett

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
150 East 42nd Street
New York, NY 10017
212-490-3000
Stephen.Barrett@wilsonelser.com